Good morning, Your Honor, if it pleases the Court, I'm Waddy Day. I represent Mr. Storrer. I have with me today Mr. Haverkamp, who also has worked on this case. You've seen his name in the briefs. I see your co-counsel is putting up the chart. We have a chart here. Do you ask permission in advance to use that? No, it's actually in my brief, so it's just a blow-up of the thing in my brief. I thought it would help to assist in the argument if I had it to go through. It is contained in the opening brief. Do you have any objection? No objection. Okay. Now, tell me where – I can't read at this point. Oh, sure, Your Honor. Just tell me where it is in the brief. It's on page 16, Your Honor. Okay. Of the blue brief? Of the blue brief, opening brief. And I thought it would be helpful, Your Honor. Okay. Go right ahead. Obviously, Your Honor, this litigation has complex facts that expand over a long period of time, starting back in 1991 all the way ongoing, I assume. It's very difficult to address it in 15 minutes. I want to limit my arguments to very limited issues. The fact I don't touch on an issue doesn't mean the Court should ignore it by no means. I'm sure you won't. I think what has been confusing to the lower court was the basis upon which they made the denial. We need to know some of the facts that they had at the time they made the denial of the claim. And that was July 25th, 1997. Counsel for the insurance argues that we'll all look at this bad history. We didn't have the records, so on and so forth. We think that's a sham investigation to start with, that as of July 25th, 1999, at the time they denied the claim, we have eight treating physicians saying and opining that this man is suffering from the major depression. Included in this is Dr. Rappaport, who did an IME because they refused to do one, which Mr. Storer paid for himself because they wouldn't pay for it. That concludes the same thing. They had that in their file. They also had in their file, in addition to all the treating physicians, they had every note of Dr. Burke, who Mr. Storer went to weekly for counseling to assist him in a major depression because he was suicidal. They actually had suicidal pact. In addition to what I've displayed here as my brief points out, they have all of the medical records of every hospital provider. They had financial records, as shown by the declaration of Ms. Robinson. There was only one thing that they did not have, and that was their own IME. And as Judge Fess stated out of the Sacramento court in the action against Paul Rivera, and that's cited in my brief, a jury might find Providence did not have sufficient information to believe that good faith dispute existed and that its refusal to obtain an IME was for fear that the IME might undermine the company's position. And Mr. Storer pled with them, as the record shows, to do that. The denial was based on the allegation or their position that he did not suffer from depression. I think that's the reason, and it's clear from the record that that is the reason why it was denied. I'm going to try to limit the issues, then, to two things, one, the general dispute doctrine, which obviously is a major issue in this case, and then the issue of the judicial admission, which is, I think, is a case of first impression before this Court. In this particular case, we have just briefly gone through the facts because of the limited time. At the time they denied the claim to Mr. Storer, they said to Mr. Storer, July 25th, 1997, we now have all the medical records, we don't need anything else, we're denying the claim. If they're doing that in good faith, they should be able to come into this Court and hold their heads high and say we deny the allegation in the complaint. And counsel argues that the allegation in the complaint is ambiguous. Read the allegation in 7 of the complaint. In paragraph 7, it's very clear. We state in the complaint that Plaintiff at such time was suffering from a partial disability which was then having an adverse effect upon his income and ability to perform and which disability continues to have an adverse effect upon his income and ability to perform work. They deny it and they deny it and they say that we do not have sufficient information to even admit or deny that. They're obligated under Rule 8 to walk into the courtroom with their heads held high and if they can in good faith deny it, to say we deny it. I took their admission, their statement, as being truth. Counsel was kind enough to point out. I, you know, it's funny. I practiced civil litigation for 25 years. I thought when you denied an allegation in a complaint, you were saying to the other side, prove it. And the Federal rule says. Was I wrong? I believe, I believe rule, I believe that rule is incorrect, that interpretation, because the Federal rule says if you have lack of information and belief, then you can deny it on lack of information and belief. And that's what they said. They should have been able to say in good faith. If they're going to look at Mr. Storer in the eye and say in good faith we're denying your claim, they should be able to walk into the courtroom and say the same thing. How can a judicial or a denial be a judicial admission? The same thing as if you admit it. No, it's not. If you admit something, you're admitting it. That's a judicial admission. If you're saying we deny it, that's not admitting that you didn't do an investigation. It does in an insurance case. And that's why I say this is a case of first impression. Most defendants in a case does not involve the defendant insurance company who had a duty before they denied the claim to ascertain the true facts. An insurance company is in a different position. They have an affirmative duty under EGAN to determine the true facts to where they can in good faith deny the claim. And if they have done their work, then they should be able to walk into the courtroom with their head held high and deny that claim. And I think there's two things that comes out of that. One is I think it's a conclusive admission, and I won't go any further than that if that's in my brief. And the second thing that leads me into it is the fact that that's evidence, that they didn't have sufficient information or do it a the work to properly investigate it to determine whether or not that statement was true. And that brings that alone brings into dispute as to whether or not you can use the genuine dispute doctrine, because that is evidence that they didn't do a proper investigation. The this case, as I say, has a lot of issues in it. But the genuine dispute doctrine requires that the underlying facts, of course, be undisputed or undisputable. We record these arguments so that if we have some doubts, we can go back and listen to them. So if you'll stay right there, it'll help us. I'm sorry, Your Honor, and I apologize. Thank you. You don't need to apologize. I think one of the important things in this case, and in all due respect to Judge Jenkins, he did not have this Court's opinion in the hand-guarded case that came down later that basically is the same facts as this case. The only difference is they did have an IME, apparently, in that case. But it's the same thing where, in our case, we try to present evidence of the systematic you're targeting site claims. And, in fact, when you compare the hand-guarded case with this case, you find it's the same players. Mr. Siemens was the claim adjuster. Mr. Mahoney, who designed a program to that's described in the hand-guarded case, his name comes up in this case as well. The only distinction between this case and the hand-guarded case is we have a different play and it went to a different courtroom. And what we're saying is these kind of cases should go to the courtroom. The Amado case, this Court has clearly stated that if the facts are undisputed or undisputable, that's when you can take it. But if under any of the under-the-place version of the facts, there's a genuine issue as to the liability, you can't apply the doctrine. I have one question I wanted to clarify. Sure. You say that your client authorized the release on 3-19-93. Now, I have one something in the file called disclosure authorization without any date on it. Is that what you're referring to? No, there's every claim form that he submits has an authorization for them to get the records for the. Want to give us a cite for that? In the briefs? No, in the record. I would have to go. Well, will you write it out when you get a chance? Yeah, I will. Let me show you this. What is this undated thing? Okay, let me explain, if I can, how this came about. Each claim has, and if you'll examine the file, has an authorization for them to go get the medical records. The problem is they did not want to go get the medical records. They wanted to send Equifax to get it, who used the students. From the word go. Yeah, from the word go. So my client was concerned because the students at the University of California, where he is a professor, teaches there, and they're going to send his students to get his psychological medical records. We said, you can go get them. Go get them. Don't use his students. And they got hung up on it. You didn't date it, though. I don't know why this is not dated. This was my recollection. It was way before they denied the claim, because at the time, we did actually misrestore guard. It's hard for us to deal with an undated authorization. This one I'm not relying upon as the authorization. Okay, well, then give us the site for the other one you are relying on. That is the ‑‑ I have one of these. I got the 22995. What's that? Well, it would be a Minter-Murphy's declaration, and I'm afraid I don't have that. I've got the 122093. But I don't have the March 93. So if you have a chance when you're sitting down to find it, it would be good. If I could send that to you, Your Honor, I'd be glad to. Thank you. And that particular one, as well as the rest, and I'll cite all of the authorizations that are assigned, because there are multiple ones. The bottom line of it is misrestore got the medical records, and they had every one of them when they denied the claim, including even the psychological notes by Mr. Burke, the therapist. Their denial was based upon, I guess, apparently, with Dr. Greenberg, who is not an independent expert. They'd never examined misrestore, never evaluated misrestore. He evaluated the other doctors with the all this. He just had questions about what they were doing. But the fact of it is they never got an independent IME and refused to. Even when they got one from Dr. Gottlieb, they still didn't make the payment until we filed the motion for summary judgment. And then three days before their opposition is due, they send a check and say we're making this payment with a reservation of right, which eventually we had to go all the way through a trial on the certification issue as to whether or not he was required to produce a certification. That's post-judgment conduct. You have about a minute and a half left. Did you want to save any time for rebuttal? I would, Your Honor. I'm sure the Court is aware of that. I would take 30 more seconds just for one more point, and then I'll sit down. The Egan case is quite important because in Egan the Court granted a directed verdict because the insurance company did not conduct an IME and did not consult the treating physicians. It's a little different in this case. They didn't conduct the IME. They consulted the treating physicians, and all of them confirmed depression and they ignored it. This is worse than the Egan case. I'll reserve my last minute, Your Honor. Okay. Can Judge Noonan have his piece of paper back? Oh, yeah. I'm sorry. Didn't I get it back? Let me get this one. Yeah, it's the one that was worked out. Thank you. Thank you, Your Honor. Okay, we'll hear from Paul Revere at this time. Counsel? Your Honors, my name is Thomas Herlihy. I'm from Kelly Herlihy & Kline in San Francisco, and I represent the Paul Revere Life Insurance Company of Worcester, Massachusetts. I'm sure the Court has many questions on this issue of genuine dispute, but I believe Judge Jenkins' ruling is appropriately affirmed by this Court, because as this Court has noted in several genuine issue cases that it has dealt with, what the Court has asked to do here is look at the record as a whole. And if the record as a whole shows the presence of a genuine dispute as to the insurer's liability, then there can be no bad faith as a matter of law. Why no I.M.E.? Well, as Judge Jenkins pointed out, there was an I.M.E. by Dr. Raffel. The fact that the plaintiff arranges for it and pays for it doesn't mean that it's not a second opinion exam. Why did Paul Revere's client accept that exam as a legitimate I.M.E., as if they had asked and paid for it? I think we have to get past the issue. The answer to that would be yes. Because I think we have to get to the point. They fully accept that independent medical evaluation as if they had asked for it and arranged for it and paid for it. I think we have to assume that doctors who are called upon to give second opinions do so honestly. There's no reason to think because Professor Storer hires Dr. Raffel, he's biased, and no reason to think that a doctor who works for our company is biased. I think we should accept in litigation that doctors give an honest opinion. Now, what is the value of that? It's a little bit unusual because in the typical case, an independent medical evaluation performed for the insurance company would be paid for by the insurance company. You'd agree with that? Yes, I would. So I share Judge Hawkins' curiosity about this. Why didn't Paul Vera conduct an I.M.E. in this case in the traditional sense? I think for several reasons. One, most importantly, is they didn't think they had enough information in order to conduct an I.M.E. If the court looks at the Mariscal decision, there's a case where the insurance company is castigated because it did not get all of the medical records and information before it made its decision. You're talking timing now. Timing in the sense of necessary to accumulate the information. Were we to send Professor Storer to an I.M.E. before we had all of the medical records, wouldn't the position of the appellant be that that was a faulty independent medical decision? Well, I don't know what their position would be, but didn't there come a point in time when Revere had the bulk of the medical information that the insured, their insured, wanted them to consider? Well, yes. It required litigation in order to subpoena and get the records. But after the litigation was filed in 1997, the company was Whether it was done kicking and screaming or willingly and wonderfully, there did come a point in time when Revere had sufficient information in its hands to evaluate the insured's condition, right? In fact, it thought it had enough information at one point in time to deny coverage, right? I think it had enough information to make a determination as to coverage. Why no I.M.E. then? Because at that point, there wasn't sufficient medical information to allow the company to conduct a valid I.M.E. Boy, I'm just puzzled by that. Because by its nature, an independent medical examination is when you send someone to a doctor. You don't, the doctor doesn't necessarily have to have all of the medical records in the past to evaluate the present condition. I don't, well, define your position on that. I just don't understand. I may be in the context of this case or a particular case, that might be so, but I don't understand why you think that you cannot conduct an I.M.E. before getting all of the medical records. Well, I'm not saying that it's a position that you cannot. But I think in this case, all this Court has to do is compare the 47-page report that Dr. Gottlieb was able to prepare after he had access to all of the medical information with the five- or six-page report that Dr. Raffel prepared who didn't have that information. And I think the weight of those reports, put aside who paid for them, but the weight of those reports is significant. The value of an independent medical exam is dependent on the amount of information that the doctor has, especially in a case like this. This Court is aware, I'm sure, that this is the case. Your policy says that you pay for the exam. Your policy says at our expense, we can have a physician of our choice examine you as often as reasonably required while your claim is continuous. It doesn't say, but we won't, we can't do that until we get all the medical records. Your Honor, I think this Court would be in a position of criticizing an insurance company for not rushing to do a medical exam before it had all the medical information. An insurance company has to have all the medical information to give some value to the medical exam. The reason that I'm sort of scratching my head here is this sounds a little bit like Joseph Heller in Catch-22. I mean, you didn't have enough information to conduct an adequate IME, but once you had that information, an IME wasn't necessary? Is that your argument? No, sir, that's not my argument. Okay. Explain me out of that quandary. In this case? Yeah. In this case, the argument is as follows. In a residual disability case, which this is what we're dealing with here, where there's no question that Professor Storer was fully working as a tenured professor at a state university teaching graduate students taxation and finance. That's undisputed. What is disputed is his claim that a depression somehow impacted a portion of his livelihood, namely his forensic work as an expert. At what point did you get his income tax returns? I believe his income tax returns for 93 and 4 were submitted during the pendency of the claim. I think they were timely submitted by Dr. Storer, and the Court will recall this claim was paid in 1993. And they did show a diminished amount of income. Yes, it did, Your Honor. Yes, it did. And I'd like to ask you about this authorization that is dated 12-2093. Why wasn't that card banished to go and get the records? Is that the 646 document? Yeah. I believe that's the one that Mr. Day drafted. That's what? That's the one that Mr. Day drafted. That's the altered authorization. Well, I can't read the signature. It doesn't look like anything is altered. It was stamped on it. It was 645. I don't know what that means. I believe there are two authorizations next to each other in the record. Right. This one is addressed to Burke. The printed authorization you're looking at is what page, sir? Well, I took it out of the record. What's stamped on it was 645, which I assume is where it came from. That's the printed authorization that we provided, and Mr. Day's authorization is 646 of the record. Look at 645. All right. I don't know the date of that, sir. Oh, I'm giving it to you. It's 12-2093. Yes. That one was the one we pointed out in our brief that by its terms is good for only one year. Okay. Why didn't they get it in that year? Pardon me? Why didn't they get the records that year? They had a whole year. We did have the records for that period of time. The issue in this case was You did have the records? For that period of time, yes, sir. From 12-2393 to 12-2094. During that period of time, we did. In fact, the claim was paid during that period of time. And you got the earlier records at that time, too. I don't believe we had knowledge at that time of the early records of Dr. Chao and the Kaiser records. I think Storrow was claiming an earlier period. He was, sir. And we didn't get the records for that? Those were in the Kaiser records, which we didn't get until several years later. Well, why didn't you get them? We didn't have a valid authorization, sir. This was a valid authorization. We weren't aware at that time that Kaiser. I mean, you read this, it authorizes you. Yes, sir. I understand that, but you need to. I mean, I don't understand why Paul Revere slept with an authorization to go back and get all the records they needed. Well, we didn't sleep on that, sir, but we weren't. What did they do? We weren't aware of the other physicians who were treating Dr. Storrow prior to that time. We used that authorization to get the medical records of the doctors identified on Professor Storrow's claim form. Who did you get records from? I believe at that time the records came from, I believe, Mr. Burke. Mr. Burke, the Maritime. Judge Burke. It was not a doctor, I guess. No, sir. But that wasn't the issue that we were dealing with. In fact, we paid the claim during that period of time. The fact that he was a Maritime. But you had from Permanente, too. You knew that you had a lot from Permanente at that time. I'm sorry, sir? I thought you just told Judge Noonan that you couldn't get the Kaiser Permanente records. We didn't get the full Kaiser Permanente records until later on in the claim handling. And you said you couldn't get it because you didn't know about it, right? I believe the position of the company was that they were not aware of the extent of the Kaiser records. But there's a letter from October 1993 to you from Kaiser. So you knew that the records were there. Is that record from what doctor, sir? From the psychiatrist. I can't read his. It's a Permanente medical group, Gerald Chan, I think. Is that right? Those were the records that we wanted to have Equifax copy. That was the issue. We wanted to get the underlying records, the psychiatric records, that would explain to us how someone could be a fully tenured professional. When did you get the letter that stated October 4, 1993? When did we get that? Yes. Within a month or so of that date, I'm sure. But then with the authorization. I'm sorry. I guess I didn't understand your answer to Judge Noon. You said, if I understood you correctly, you said we didn't know about the Kaiser records in 1993. The breadth of the Kaiser records, which included treatment by Dr. Chow and other physicians, we weren't aware of. We could never get them. Excuse me. Yes, sir. Breadth is different from knowledge. Breadth means you don't think you got all of them. Knowledge means you could use the disclosure you had to go get them in 19. Am I missing something here? I don't think so. But the fact in this case was when we attempted to get these records, this is when we were strong-armed by Professor Storer and his lawyer who said we don't want Equifax going there to get those records. Okay. What's wrong with that? Weren't his concerns entirely legitimate? His medical records, from his point of view, contain information that's sensitive to him. I don't think any of us can speak for him and say you're being foolish in your concerns. However, in the context of an insurance claim, in the nature of the business that we're in, of all the things that this company has ever been accused of, they've never been accused of disclosing inappropriately someone's records. But Equifax was in a different position. Didn't they have their own people out here that they have to rely on Equifax? Equifax is used across the board for photocopying, and at the time our people were involved in the claim in meeting with Mr. Day, he was insistent that the records go through him. I don't think it's inappropriate or reasonable. But what gives you the right in your insurance contract to say we will only accept a consent on our form? Consent for what, Your Honor? Medical. Release of medical records. You're saying you wrote back and said we will not accept this consent form. Mr. Day's consent form authorized the records to be sent to him, not to us. I think the insurance company is entitled to have direct access to those records. And what provision of the contract says that? The requirement that there be proof under the policy. It's true, is it not, that there's not anything in the policy that says you're required to use this form and you have to get proof of medical records. But there's nothing that says that you have to use our forms, that we have to confine our disclosure. I mean, it's not unusual for a plaintiff's attorney to redraft a consent form, particularly in this era of HIPAA disclosure restrictions and so forth. I mean, a lot of times you get a disclosure request that's blanket, and you say, oh, no, we're not going to do that. We're going to redraft it. That's not unusual. Now, this is a little bit more unusual, but his concerns aren't illegitimate. I think the key issue here was the insistence that the records go through him and not directly to the insurance company. And in answer to your question, I would have to say that the basis for that request is the history of bad faith law that would tell an insurance company if you don't have all of the medical information and analyze that information, then you are not handling the claim properly. And for an insurance company to be criticized in this case because it wanted to get all of the medical information so that it could have a 45-page independent medical exam done at a point in time seems to me to be accusing the company of either doing too much or too little when all it is attempting to do is fulfill its duty, its duty to investigate a claim. All I had to say was we're not going to use Equifax according to the disputed facts. Now, you dispute that, but, you know, we're at summary judgment. You know, that's true. That is an issue in this case. But beyond that, Judge Jenkins looked at this case and said, look, in light of the whole record here, what did we see? We saw a company with legitimate questions concerning the extent of a residual disability to wit a professor teaching graduate students taxation who at the same time claims a pervasive depression prevents him from doing forensic work. It's a legitimate question. Kennedy. But they have a plausible explanation of that, that it was different doing routine teaching from being creative in the seminars. I mean, that's not beyond belief. I think they make it sound like teaching graduate students taxation and accounting is like doing the multiplication table for third graders. It's kind of a put-down for graduate teaching, true, but. Well, it's a graduate professor at a State university teaching graduate students taxation and financing. Anyway, the university is not the University of California. That's a small school, but there are those who love it, Your Honor. Oh, yeah. The fact that we're debating that issue, the fact that we're debating this issue and questioning it, I think points to the genuine issue that was here on the psychological claim. Putting aside, of course, that there was also a financial information required of Professor Storer in order to document a loss of earnings. So it's not just medical information, but financial information, which California law is clear the insurance company is entitled to on a month-by-month basis under the ERICA rule. Okay. Thank you for your argument. We'll hear rebuttal at this time. Thank you, sir. Thank you, Your Honor. Obviously, one minute is very brief, but I will attempt to hit some of the high points. They did not receive any of these medical records that Dr. Gottlieb relied upon after the litigation as a result of discovery. Every one of these records were available and in their file at the time they denied the claim and refused the IME as of July 25, 1997. And that's when the bad faith is when we say we close the case and will not consider an IME or any other evidence. They had ever medical records and they even had the notes of Mr. Burke, the licensed therapist. Our concern with Equifax is very simple. Equifax, when you look at Dr. Burke's weekly notes, Mr. Storr talks about sex with his wife, his sexual relations with his wife, his parent-child relationship with his mother. This is not the kind of information his students at Cal State Hayward should be going there and we have a concern. That's a legitimate concern. They had two choices. They can go there under the authorization and get the records themselves or, as Mr. Storr did, pay for them and they send them. But they had every record. The record they heard was that your demand was not only don't do it through Equifax, but that you were saying it had to be done through someone, one of your agents had to go get it. That's not correct. Now, I'll point out, I'll send Judge, the bench here, a list of all the different authorizations, because there's one with Everclaim and there's a lot of them in the file, because Everclaim has an authorization that the insurance company can go direct and they was pleased, when you read the declaration, they was pleased, please contact them directly. Dr. Greenberg, there's correspondence between Dr. Greenberg and Dr. Raffel. There's letters back and forth. And so that's there. But I think that was a legitimate concern. The denial, when you come down to it, is the fact that they hired Dr. Greenberg, who is not an independent. He works for them. He uses their stationery. He works at their offices to create what they will hope to be a dispute. And he says, look, he made a life choice. And as Dr. Gottlieb points out, this is not a life choice. Depression is not that. Generally, if you have a high-performing professional that makes a life choice, as Dr. Gottlieb points out, they make a change in their life completely. And as to quote him, they sail around the world, move to a Montana ranch and the like. Mr. Storr didn't do that. He cut from $29,000 a year as a national lecturer, lecturing to large CPA groups and consulting to teaching 15 or 20 students in a classroom who don't know the tax law. He goes from teaching CPAs and the most tax professional people in the world and testifying before Congress to some students. And I can tell you that the stress in teaching before students is a lot less than the stress, for instance, being before this Court. This life choice. Roberts. You're well over your time. One point. One sentence. One sentence. The argument that they use, that he made a life choice to take Prozac and take these medications and to go counseling every week and take this loss of income was a choice by him is a genuine issue of fact. If they want to say it's good faith, it's for the jury to decide. Okay. Thank you for your argument. Thank both sides for their argument. The case just argued will be submitted for decision. Now, I want you to listen to this very carefully. Yes, sir. Okay? You are within five days to provide us with a letter that lists the authorization from the record. No argument, no surplusage, no description, just the date and where we can find it in the record sincerely yours. You understand? I will, Your Honor. And you may respond if he does anything other than that. Do you understand? Yes. Okay. Or if his list is incomplete. May I point to statements in the record indicating where the appellate insisted that the disorder information go? Sure. And may I? I'm sorry, because there's also in the information where we pled with him to go directly to the doctors. If we need something further from you after we receive these two letters, we'll ask. Okay? Thank you. Thank you. All right. We'll now proceed to United States v. Lynn. I'm from Idaho, so it's going to take a while. You want 10 days? Can I have 10 days, Your Honor? You've got 10 days. You've got 10 days. If you keep talking, I'll make it three. Okay. Thank you.
judges: Noonan, Hawkins, Thomas